41 P.3d 631

**ARIZONA DEPARTMENT OF REVENUE, Plaintiff–Appellant,**

v.

**ARIZONA OUTDOOR ADVERTISERS, INC., Defendant–Appellee.**

**No. 1 CA–TX 99–0012.**

Court of Appeals of Arizona, Division 1, Department T.

March 7, 2002.

Janet Napolitano, Attorney General by Joseph Kanefield, Assistant Attorney General, Phoenix, Attorneys for Plaintiff–Appellant.

94

Ben Pearson, P.C. by Ben Pearson, Phoenix, Attorneys for Defendant–Appellee.

## OPINION

SULT, Judge.

¶ 1 In this transaction privilege tax case, the Arizona Department of Revenue appeals from a judgment adverse to its attempt to treat Arizona Outdoor Advertisers' income from the rental of billboard space as income from the commercial leasing of real property. Arizona Outdoor claims that its billboards, erected on real property owned by and leased from others, are personal property and should be classified as such. The resolution of this dispute depends on whether the billboards, after they are erected, become "fixtures" and part of the realty or remain personalty. The Tax Court found that the billboards remained personalty and, because we agree with this result, we affirm. In doing so, however, we depart from the traditional fixtures analysis used by the Tax Court and employ a modified approach that does away with some confusing legal fictions and unnecessary evidentiary restrictions imposed by traditional analysis.

## BACKGROUND

¶ 2 Arizona Outdoor leases small plots of land on which to erect its advertising billboards, usually a smaller piece of a larger business parcel. Once a billboard is erected, it is leased to others for use in displaying advertising sign panels. During the four-year period for which the Department seeks to impose a tax, Arizona Outdoor had twelve billboards in place.

¶ 3 The billboards are manufactured in a modular fashion to facilitate assembly, disassembly and transport. The sign panels and platforms are wood and the vertical poles and frames that support them are steel. Depending on a billboard's size and height, the poles are placed in the ground in holes that range from 3 to 4 feet in diameter and 6 to 14 feet in depth. The billboards are built for normal Arizona weather and can withstand winds of up to 100 miles per hour.

¶ 4 Once the poles are in place, the billboard framework is bolted to them. Electrical components including time clocks and light fixtures are also attached to the poles and those components are powered from a meter loop. The sign panels on which the advertisements are placed are simply hung from the framework.

¶ 5 For each billboard location, Arizona Outdoor leased land for a fifteen-year term. The lease agreements provide in pertinent part:

> 8. Lessee shall have the right to permit others to place signs owned by them on the [billboard], and such signs shall be subject to the terms and conditions of this Lease. It is agreed between the parties that Lessee, or such other person, as the case may be, shall remain the owner of all of said advertising signs, structures and improvements, and that, notwithstanding the fact that the same constitute real estate fixtures, the Lessee or such other person, as the case may be, shall have the right to remove said signs, structures and improvements at any time during the term of this Lease, or after the expiration of this Lease.

The affidavit of William Pearson, Sr., Arizona Outdoor's corporate president, states: "Any language in the lease agreements relating to the billboards being real estate fixtures is inadvertent, having come from boilerplate in another contract." The Department does not controvert this assertion.

¶ 6 While the stated duration of each lease is for an initial fifteen-year term followed by successive fifteen-year renewal terms, Arizona Outdoor can terminate a lease at the end of any monthly period merely on thirty days' advance notice. In addition, Arizona Outdoor can terminate "[i]f the view of any of Lessee's signs is obstructed or impaired in any way, or if the value of such signs is diminished by reason of diversion or reduction of vehicular traffic, or if the use of any such signs is prevented or restricted by law, or if for any reason a building permit for erection or modification of any such signs is refused...." The lessor can terminate on thirty days' advance notice before the end of a lease term, or by notifying Arizona Outdoor that it intends to improve its land by building a permanent commercial or residential building.

¶ 7 Upon termination, Arizona Outdoor has the right to remove the billboard structure from the realty. Removal is accomplished by severing the legs of the structure at ground level, leaving the in-ground portion in place, and moving the rest of the structure to another location and re-erecting it. Arizona Outdoor has consistently removed its billboards over the years as billboard locations ceased satisfying their intended purpose or lessors decided upon another use for their property.

¶ 8 The Department audited Arizona Outdoor for the period August 1988 through July 1992 and determined that its gross income from sign rentals was income from the commercial lease of real property under Arizona Revised Statutes ("A.R.S.") § 42–5069 (1999). It therefore assessed delinquent transaction privilege taxes, interest, and penalties, and Arizona Outdoor protested. The Department rejected the protest, but on appeal, the Arizona Board of Tax Appeals sustained Arizona Outdoor's position and concluded that Arizona Outdoor was not liable for an assessment under the real property commercial leasing classification.

¶ 9 The Department brought this action in the Arizona Tax Court challenging the Board's ruling. The court applied traditional fixtures analysis and found that notwithstanding the affixation of the billboards to the land and their adaptation to use with real property, they never became part of the realty because "[t]he record supports Defendant's contention that the billboard structures were intended, and did in fact remain the Defendant's personal property." The court therefore granted summary judgment to Arizona Outdoor, and the Department timely appealed.

## ISSUE

¶ 10 Pursuant to A.R.S. § 42–5069, the state imposes a transaction privilege tax on business income generated by leasing the use or occupancy of real property for a consideration. Subsection F(2) of that statute defines real property to include any "improve-

ments, rights or interest in such property." The Department contends that the billboards constitute improvements to real property within the meaning of subsection (F)(2), whereas Arizona Outdoor contends the billboards are personalty and fall under A.R.S. § 42–5071 (Supp.2001), which imposes a transaction privilege tax on income from the leasing of personal property. We must determine which assertion is correct.

## ANALYSIS

### *Brink Electric Co. v. Department of Revenue*

¶ 11 Our first task is deciding what analytical framework to employ in determining whether these billboards are realty or personalty. The Department places primary reliance on the analysis this court utilized in *Brink Electric Construction Co. v. Arizona Department of Revenue*, 184 Ariz. 354, 909 P.2d 421 (App.1995), and a brief summary of that case is appropriate. In *Brink*, the transaction privilege tax at issue was that imposed on the business of prime contracting. Among other activities, prime contracting was defined to include constructing any "improvement on real property." *See* A.R.S. § 42–5075(H)(6) (Supp.2001) (formerly § 42–1310.16(F)(2)). The *Brink* court found it necessary to determine whether the installation of a moveable electric power substation was an improvement to real property.

¶ 12 To resolve the issue, the court adopted a test from a South Dakota case involving the same company engaged in the same activity,[1] and applied the following criteria to decide that the substation was an improvement to real property:

(1) its actual or constructive annexation to the realty;

(2) its adaptability to the use and purpose for which the realty is used; and

(3) the intention of the party making the annexation.

184 Ariz. at 361, 909 P.2d at 428.

¶ 13 This three-part test to determine an "improvement to real property" is in fact the

---

1. *Brink Electric Construction Co. v. South Dakota Department of Revenue*, 472 N.W.2d 493 (S.D. 1991).

traditional test for determining whether an item of personal property has become a "fixture." *See* 8 Richard R. Powell, *Powell on Real Property*, § 57.05 at 57–25 (Michael A. Wolf ed.2000) (hereinafter *"Powell"*) ("Fixtures are 'goods' from the realm of personal property that have such a close relation to real property that they are capable of being an interest under real estate law."); 5 *Thompson on Real Property*, § 46.01(e) at 511 (Thomas ed.1994) (hereinafter *"Thompson"*). The test originated in *Teaff v. Hewitt*, 1 Ohio St. 511 (1853), and is designed to ascertain whether and when goods lose their identity as personalty and become part of the realty, thereby becoming subject to the laws governing realty.

■ ¶ 14 At this point in our discussion, we detour from searching for an analytical model in order to discuss a misconception that could arise from using a fixtures test to determine an improvement to real property. The statute being construed in *Brink* spoke of such an improvement, as does our statute, A.R.S. § 42–5069. However, "improvement" is a broader category of things than "fixture" and encompasses everything that permanently enhances the value of premises for general use. *See Tax Appeal of Logan and Associates*, 331 N.W.2d 281, 283 (S.D.1983) (citing 41 Am.Jur.2d *Improvements* § 1 (1968)). Improvement certainly includes fixtures, but the term also includes such things as roads or ditches that usually are not classified as fixtures. *Id.*

¶ 15 The facts in *Brink* were particularly suited to the use of a fixtures test, and *Brink* was correct in its application of the test. However, because fixture is a narrower category of things than improvement, it is important to acknowledge that while it is sometimes appropriate to employ fixtures criteria to test for realty improvements, sometimes it is not. For example, if a landowner digs a simple ditch on his property and leases it for a fee to an adjacent landowner to transport water, he cannot escape taxation under A.R.S. § 42–5069 by asserting that no personal property was brought upon the realty and affixed thereto in constructing the ditch. Although the ditch is not a fixture, it still is an improvement to the real property and one

that the legislature meant to include within the scope of A.R.S. § 42–5069.

¶ 16 This case is appropriate for analysis using fixtures jurisprudence because if the billboards are fixtures, they necessarily are improvements. Conversely, if they are personalty they cannot be improvements because the temporary nature of their occupancy means that they do not *permanently* enhance the value of the realty. *Tax Appeal of Logan*, 331 N.W.2d at 283. We also note that the particular facts of this case, involving bringing goods onto real property and affixing them, are suited to an analysis employing fixtures jurisprudence, and the bulk of the reported cases concerning billboards employ some variation of fixture analysis. *See, e.g., Aquafine Corporation v. Fendig Outdoor Advertising Co.*, 155 Ga.App. 661, 272 S.E.2d 526 (1980) (billboards were personalty or removable trade fixtures); *City of Cleveland v. Zimmerman*, 22 Ohio Misc. 19, 253 N.E.2d 327 (Prob.1969) (billboards were personalty, not fixtures); *Creative Displays, Inc. v. South Carolina Highway Department*, 272 S.C. 68, 248 S.E.2d 916 (1978) (billboards were not fixtures and were therefore not compensable as realty). However, we caution that neither *Brink* nor this opinion should be read as limiting the meaning of "improvements to real property" solely to improvements that constitute fixtures.

## The *Teaff* Fixtures Test

¶ 17 Returning to the question of an analytical model, we first consider whether the test for fixtures articulated in *Teaff* should be applied without modification in this case. Reiterating the test, *Teaff* holds that an item of personalty becomes a fixture and a part of the realty if (1) it is annexed to the realty, (2) it is adapted to the purpose to which the realty is put, and (3) the annexor intended at the time of the annexation to make the personalty a permanent part of the realty. 1 Ohio St. at 530.

¶ 18 Since the 1853 decision in *Teaff*, which involved a question whether a mortgage covered various types of machinery in a woolen mill, this test for fixtures has been used in a variety of settings including landlord/tenant, owner/trespasser, vendor/vendee, and li-

censor/licensee. *Thompson,* §§ 46.02(c)-(h). Most courts, without questioning its conceptual underpinnings, have accepted the test as part of traditional real estate doctrine. As one commentator has noted, *Teaff* "put forth a formula, which has been almost slavishly repeated by the American courts ever since." Walter B. Raushenbush, *Brown on Personal Property,* § 16.1 at 516 (3d ed.1975) (hereinafter "*Brown* ").

¶ 19 One authority, however, directs several criticisms at the *Teaff* test and in fact proposes that the entire fixtures doctrine be abandoned. Professor Ronald W. Polston, writing both in *Thompson* and separately, suggests that the *Teaff* test failed from the beginning in its attempt to create a unified test that was usable in all the different contexts in which the issue of personalty becoming realty can arise. *See* Ronald W. Polston, *The Fixtures Doctrine: Was It Ever Really the Law,* 16 Whittier L.Rev. 455 (1995) (hereinafter "*Polston* "). Nevertheless, it continues to be almost universally applied by American courts even though it injects an irrelevancy into the decision-making process, creates an awkward fiction that misdirects the inquiry, and requires contorting the language to achieve just and consistent results. *See id.* Because we conclude that Professor Polston's criticisms have merit, because we have criticisms of our own, and because we conclude that a fixtures test modified to address those criticisms should be employed in the taxation-of-realty context, we turn to an analysis of the problems with *Teaff,* followed by adoption of a modified test designed to meet these criticisms.

¶ 20 An initial criticism by Professor Polston is that because the test rests on the annexor's intent as of the time the personalty is physically affixed, it illogically makes that point in time the only relevant focus for a fixtures inquiry. *Thompson,* § 46.02(b)(3) at 521–22. This temporal limitation results because *Teaff* uses the physical act of annexation both as its starting point and its ending point. The test directs that if the affixation consists of an actual physical connection of the personalty to the realty, the personalty becomes a permanent part of the realty at the instant of affixation so long as it comple-

ments the use to which the land is put and the annexor, at that particular moment, intends the personalty to permanently join the realty. Professor Polston describes this as a "magic moment" test, which seeks by the convergence of the three test factors at the instant of affixation to establish in perpetuity the relationship the personalty bears to the land, the relationship the personalty bears to those persons then involved with the land, and the relationship the personalty bears to all persons who thereafter become involved with the land, whether as vendee, mortgagee, or in any of several other capacities to which the test could apply. *Id.,* § 46.01(a) at 504–05.

¶ 21 Professor Polston illustrates the absurdity of focusing on intent at affixation to create such important consequences. He notes that when annexation is accomplished by the owner of the realty, the owner's intent is irrelevant because, in actuality, no enforceable legal consequences attach at that point. The owner can remove the personalty at will and without penalty, and if he does, those "forever" consequences suddenly evaporate. *Id.,* § 46.02(b)(3) at 521–22. Thus, ascertaining the intent of the annexor at affixation often yields only an irrelevancy, yet the *Teaff* test treats it as controlling.

¶ 22 Intent as a test element should be measured as of a time when it is probative of something material. For example, the status of the purported fixture may be brought into question when the owner decides to sell the land. Professor Polston notes that if the parties in their sales agreement fail to account for the item and its character becomes an issue

> to the extent that intention is a factor in making such a determination, it must be an intention that is common to the parties to the relationship.

*Id.,* § 46.02(b)(3) at 522.

¶ 23 Thus, in a two-party relationship, when intent factors into the characterization of an item, it should be the present, mutual intent of the parties to the agreement. *Id.* It borders on the irrational to resolve a problem arising from a present transaction by harking back to a time before the parties' agreement, and resting the resolution on the

intention of the original annexor, who may not even be a party to the present transaction. *Id.* at 522–24. Only if the events giving rise to a dispute logically relate to the time of annexation should the resolution focus on original annexor intent.

¶ 24 Another example of *Teaff's* shortcomings is found in the treatment given the annexation element. Professor Polston notes that *Teaff* clearly intended that an actual physical connection between the personalty and the realty must be created before the item could become a fixture. *Polston,* 16 Whittier L.Rev. at 465. Yet several cases have held an item to be a fixture even though it had no physical connection to the land. *See id.* n. 34, nn. 63–67. Such cases are explained on the basis that when other factors point strongly toward the conclusion that the item has become a permanent part of the realty, the requirement of physical annexation is simply dispensed with. *Brown,* § 16.2 at 520.

¶ 25 An example of such a case is *Cornell College v. Crain,* 211 Iowa 1343, 235 N.W. 731 (1931). There the question was whether three farm buildings were covered by a mortgage and therefore passed to the mortgagee via a deed in lieu of foreclosure executed by the landowner. The buildings were a granary, a corncrib, and a hoghouse and all were attached to skids so that they could be moved about the property. Notwithstanding the absence of a physical connection to the ground, the court found these buildings to be fixtures under the *Teaff* test because they were particularly suitable to the operation of that farm. The court dealt with the requirement of a physical annexation by stating that "a physical attachment of the structure to the soil or to an appurtenance thereto is not essential to make the structure a part of the realty." *Id.* at 732.

¶ 26 *Cornell College* illustrates that the test as conceived by the *Teaff* court tends to create barriers to achieving a just outcome rather than smoothing the way. Thus, if actual physical annexation were treated not as indispensable but as merely a factor to consider, courts could make fixtures determinations in a straightforward manner. It would not be necessary to pay lip service to *Teaff* but then engage in intellectual evasiveness to avoid the inequity resulting from strict compliance with the test.

¶ 27 A further problem with *Teaff* is that it unduly confines the inquiry. Common sense teaches that in an investigation into the proper characterization of personalty, there are many factors that could point the way to the correct answer. *Teaff,* however, limits the inquiry by selecting three of these factors and elevating them to the status of test elements, thereby implying that these factors are the only ones relevant to the issue. If applied strictly, the test would preclude consideration of factors as pertinent as a written agreement between the parties, a long-standing custom in an industry, or even whether the item in question adds to or subtracts from the value of the realty.

¶ 28 Not surprisingly, courts have tended to avoid the restrictions implicit in the test in order to consider other relevant factors. One way courts have accomplished this is the treatment accorded the intent prong of the test. Early on, courts decided that this intent should not be the actual, subjective intent of the annexor. *Thompson,* § 46.02(b)(3) at 522–24. Rather, the intention to permanently affix or not was deemed to be an assumed intent, often called an "objective" intent, that was to be gleaned from the appearance the item of personalty created when it was placed upon the realty. *Id.* This appearance was ascertained from the circumstances that surrounded the annexation, and because there was no limitation placed upon the nature of the circumstances that could be considered, courts could and did open the door to a consideration of many other relevant factors.

¶ 29 This objective intent approach, although helpful in overcoming the unacceptable narrowing effect of *Teaff's* methodology, nevertheless suffers from at least two defects. First, it perpetuates *Teaff's* approach of determining intention only as of the time of annexation, which, depending on the legal context, may or may not be the relevant period on which to focus. Second, some courts have construed the search for objective intent as precluding evidence of the subjective intent of the annexor, whether he is

the owner of the realty or one of the parties to the transaction giving rise to the present dispute.

¶ 30 An example of the latter problem is illustrated by *United States v. County of San Diego*, 53 F.3d 965 (9th Cir.1995). In that case, the court applied the *Teaff* test and found that a nuclear research device owned by the government but placed within the taxpayer's building was a fixture for purposes of a local real property tax. As for how the government and taxpayer thought of the device, the court rejected any consideration of their intent, stating, "the fact that the parties themselves may have intended the device to remain the personal property of the United States, as evidenced by their contract, is irrelevant". *Id.* at 969.

¶ 31 It is certainly appropriate to approach fixtures determinations using an objective standard so as to avoid the intolerable inconsistencies that would result if the subjective intent of each annexor controlled the outcome. And we presume that fear of such inconsistencies is the underlying motivation for the exclusion of subjective intent evidence. However, the remedy is not logically connected to the fear because considering subjective intent does not preclude objectively reaching a conclusion.

¶ 32 For example, an adjudicator considering a fixtures question may find subjective intent helpful in giving meaning to other evidence in the case, particularly in those instances where a written agreement is the principal source of information regarding that intent. On the other hand, he may find that other evidence belies the subjective intent expressed in the agreement, in which case he is not bound by these expressions. Rather, he may reject the subjective intent evidence and make a contrary finding if he concludes that other evidence compels a different characterization. This method of considering evidence is precisely how an objective inquiry operates, and its objectivity is not undermined by considering subjective intent evidence. *Cf.* Rule 402, Arizona Rules of Evidence (in the normal adjudicatory process, "[a]ll relevant evidence is admissible").

¶ 33 A test like *Teaff's*, which purports to provide the answer to a significant legal question, should not be as awkward to apply as experience has shown the *Teaff* test to be. What is needed is a test that is intellectually honest, that invites consideration of all circumstances that might bear on the fixtures inquiry, and that permits consideration without the kind of language-skewing exercise necessitated by *Teaff*. This test should bar evidence only because it fails the probative value criterion of Rule 401, Arizona Rules of Evidence, and it should direct the inquiry to the relevant time frame, either the time of the original annexation or a later time.

### The Reasonable Person Test—Proposal

¶ 34 One authority has suggested that the *Teaff* test, as modified by the "objective intent" explication, is actually a "reasonable person" inquiry. *Brown*, § 16.1 at 517. Professor Raushenbush, author of the *Brown* treatise, states that what *Teaff* essentially is asking is: "Would the ordinary reasonable person validly assume that the article in question belongs to and is a part of the real estate on which it is located." *Id.* As the professor explains this restatement of the test, however, it becomes clear that it represents only a limited departure from the traditional approach. This is so because the reasonable person's assumption is to be determined from a restricted list of factors, two of which are the annexation and adaptation factors of *Teaff* with the third being "the nature of the article." *Id.*, § 16.5 at 537. Moreover, there is no indication from Professor Raushenbush that he intended the reasonable person to answer the question other than as of the time of annexation, the same as *Teaff*.

¶ 35 We nevertheless believe that a reasonable person test, if properly constructed, is a preferable alternative to *Teaff*. Such a test would permit the hypothetical reasonable person to consider all the circumstances that might be relevant to the particular case, and he would have the flexibility to consider those circumstances as of a point in time when they are material, not just as of the time when the item was originally affixed. Thus, the test for whether an item of personalty has become part of the realty would be stated as: Would a reasonable person, after considering all the relevant circumstances,

assume that the item in question belongs to and is a part of the real estate on which it is located?

¶ 36 The primary virtue of the test we propose is that it abandons any pretense of literal adherence to the *Teaff* test and there- by does away with the strained, evasive, and awkward applications *Teaff* has engendered. It maintains the preferred standard of objective measurement and corrects for the major shortcomings of the *Teaff* test, namely artificial restriction of the test to the time of original annexation, unjustifiable confinement of the process to just the three *Teaff* factors, and unwarranted exclusion of evidence of subjective intent, either of the original annexor or of the parties to an agreement regarding the property.

¶ 37 We also note that notwithstanding this rejection of the *Teaff* methodology by adopting a different approach, *Teaff* jurisprudence is not being entirely discarded. While *Teaff*'s three factors will no longer limit the inquiry, they will continue to play a major role. In fact, annexation will probably continue as the triggering event for most fixtures inquiries. In addition, the century and a half of *Teaff* case applications remain available as source material on which to draw for specific relevant circumstances that can easily be integrated into a reasonable person inquiry.

### The Reasonable Person Test—Adoption

■  ¶ 38 We turn now to our holding. In the preceding analysis, we have spoken broadly, incorporating different legal contexts such as vendor-vendee into the discussion to demonstrate why change is needed and the type of change required. The holding must be narrower. We hereby adopt the reasonable person test set forth above as the appropriate analytical framework for determining the existence of a fixture, but only in the context of characterizing property as real or personal for tax purposes. We limit our holding in this fashion because it is good judicial policy to do so, as we explain.

¶ 39 We are convinced that the reasonable person test will function well in classi-

fying property for purposes of taxation. As one commentator has stated in discussing fixtures in the taxation context: "The most important factor would seem to be to have a certain and workable rule under which both the tax assessor and the person subject to the tax can most efficiently operate." Harold W. Horowitz, *The Law of Fixtures in California—A Critical Analysis,* 26 So. Cal. L.Rev. 21, 57 (1952) (hereinafter *"Horowitz "*). We believe that the reasonable person test we propose satisfies this requirement because it is broadly inclusive evidentially, and it focuses the inquiry onto the time period that is of concern both to the taxing authority and the taxpayer. In short, it is not only workable, it has the capacity to efficiently deliver just results.

¶ 40 However, we do not extend the reasonable person test beyond the taxation context because the question whether such a test would have the same beneficial effect in other legal contexts is too large to be answered here. That issue should be left to other courts to be determined in future cases where different facts and different policies may require further modification of the test.[2] *Teaff* stands as an example of the mischief that can result when a "one-shoe-fits-all" test is created. We believe that in this area, incremental change is best.

### Disposition

¶ 41 Normally in the law, ascertaining what a reasonable person is, does, or believes is considered to be a question of fact. In *Teaff* jurisprudence, however, the ultimate question of the existence of a fixture has usually been decided as a matter of law. *Brown,* § 16.1 at 517. The reason, as the California Supreme Court observed in *Crocker National Bank v. City and County of San Francisco,* 49 Cal.3d 881, 264 Cal.Rptr. 139, 782 P.2d 278 (1989), is that "the classification of an object as a 'fixture' or as 'personal property' is not a factual description of the object, but a statement of a legal conclusion or result as to entitlement to the object." *Id.* at 281–82 (internal citation omitted). There-

---

2.  For example, Professor Polston suggests that a fixtures test is not even needed in the vendor-vendee context as the basic question posed can

and should be answered by resort to contract construction principles, the same as any other contract question. *Thompson,* § 46.02(c) at 524.

fore, "on appeal a trial court's classification of a particular item as a fixture must be reviewed independently." *Id.* at 281.

¶ 42 We agree with *Crocker* but add this caveat. For an appellate court, determining a fixtures question as a matter of law is appropriate only if, as is the case here, the underlying relevant factors are themselves undisputed. Any dispute regarding the existence of a material fact must first be resolved at the trial level. Once that occurs, the trial court acting as the reasonable person will make the initial fixtures determination, usually in the context of a summary judgment proceeding, and it is that determination which will be subject to our independent review. *Cf. Horowitz,* 26 So. Cal. L.Rev. at 23.

¶ 43 We have no unresolved factual disputes impeding our review, so we begin, as the reasonable person test permits, with the expressions of intent contained in the parties' lease agreements. Extended analysis is not necessary to conclude that Arizona Outdoor's expressions cannot be reasonably viewed as an intent to create permanent additions to its lessors' freehold. The agreements unequivocally declare that Arizona Outdoor would remain the owner of the billboards, and the agreements grant Arizona Outdoor the right to remove the billboards. Importantly, removal was possible without any significant event occurring, requiring merely thirty days' notice of termination.

¶ 44 As to how this right of removal should be viewed, we note that when an item of personalty truly transmutes into a fixture, it becomes a part of the realty and ownership normally passes to the person holding title to the land. *Powell,* § 57.04(4) at 57–19 to 57–20. But a continuing right by a non-land-owning annexor to remove the item would be inconsistent with ownership passing to the landowner. Thus, if there is a right of removal, the reasonable person would conclude that ownership of the item did not pass to the landowner and the item is therefore not a fixture.

¶ 45 The evidence also indicates that throughout the duration of these lease agreements, Arizona Outdoor's intent was shared by the landowners on whose property the billboards were erected. In addition to the right of removal each landowner granted Arizona Outdoor in the agreements, two of these landowners filed separate affidavits making it clear that they always understood and intended that the billboards were to remain the personal property of Arizona Outdoor and that there had never been any discussions about the billboards becoming fixtures. No contrary affidavits were submitted. Thus, the reasonable person would perceive that Arizona Outdoor's consistent assertions that it intended the billboards to remain personalty were not just self-serving statements created after the fact to gain some advantage. As a mutual intent shared by both parties to each lease, the persuasive impact of Arizona Outdoor's expression of intent increases significantly.

¶ 46 The historical evidence of Arizona Outdoor's billboard business is also relevant. In every case in which the lease has terminated, Arizona Outdoor has removed its billboards and erected them elsewhere. In fact, the billboards are designed in a modular fashion specifically to facilitate easy assembly, disassembly, and transport. The reasonable person would view this capacity to quickly recycle the billboards and the historical evidence that recycling consistently occurred as strong evidence that these billboards are inherently personalty.

¶ 47 The Department does make two arguments in support of its position. It first argues that the fact that the billboards were physically connected to the realty by placing the support poles 6 to 14 feet deep in the ground weighs heavily on the side of finding the billboards to be fixtures. The Department next urges that the language in the leases that granted Arizona Outdoor the right to remove the billboards "notwithstanding the fact that the same constitute real estate fixtures" is conclusive that Arizona Outdoor viewed the billboards as fixtures.

¶ 48 Addressing the latter point first, Arizona Outdoor's principal has averred that the inclusion of the "fixtures" reference was "boilerplate" from other contract forms used by the company and was inserted into the subject contracts inadvertently. The Department never controverted this averment but still argues as though the assertion of

inadvertence had not been made. The argument thus appears to create a factual issue that could halt our review and require remand. However, we conclude that a resolution of the issue is not necessary because even if the inclusion of the contested "fixtures" reference was resolved against Arizona Outdoor and its inclusion was deemed intentional, that finding would undermine rather than support the Department's position.

¶ 49 Assuming Arizona Outdoor intentionally included the disputed language because it thought the billboards might be viewed as fixtures, a reasonable person being so informed would conclude that the language was inserted, not as an admission to a legal conclusion, but as a device to permit Arizona Outdoor to defeat the consequence of someone else concluding that the billboards were fixtures; *i.e.*, the consequence that title to the billboards would be lost to the landowner. Prudently providing a right of removal to guard against the consequence of someone discerning a fixture where one was not intended cannot reasonably be viewed as a legal admission that the billboards were fixtures. To the contrary, such prudence provides more evidence that Arizona Outdoor intended the billboards to remain personalty.

¶ 50 The Department is left with the sole factor of physical annexation upon which to base its assertion that these billboards are fixtures. Arrayed against this single indicator is a substantial quantum of contrary indicators that renders the fact of annexation insignificant by comparison. Thus, to the question whether, after considering all the relevant evidence, a reasonable person would assume that the billboards belonged to and were a part of the realty for the audit period of August 1988 through July 1992, the answer must be no.

## CONCLUSION

¶ 51 We affirm the Tax Court's conclusion that the billboards in this case are personalty. Arizona Outdoor has requested attorneys' fees on appeal and in the exercise of our discretion we grant this request upon Arizona Outdoor's compliance with Rule 21, Rules of Civil Appellate Procedure.

CONCURRING: REBECCA WHITE BERCH, Presiding Judge, and E.G. NOYES, JR., Judge.