388 P.3d 821

ABCDW LLC, et al., Plaintiffs/Appellants/Cross–Appellees,

v.

Lloyd E. BANNING, Sr., Defendant/Appellee/Cross–Appellant.

No. 1 CA–CV 15–0261

Court of Appeals of Arizona,
Division 1.

FILED 12/30/2016

Udall Shumway, PLC, Mesa, By Ryan P. Dyches, Counsel for Plaintiff/Appellant/Cross–Appellee ABCDW LLC

Plattner Schneidman Schneider Jeffries & Plattner, PC, Scottsdale, By Jeff Schneidman, Counsel for Plaintiff/Appellant/Cross–Appellee Van Leeuwen Buckeye, LLC

Zwillinger Greek Zwillinger & Knecht, PC, Phoenix, By Monty L. Greek and Sara Witthoft, Counsel for Plaintiffs/Appellants/Cross–Appellees Melanie Nevitt, LLC; Melanie Gila Bend II, LLC; Pantano Banning, LLC

Jennings Strouss & Salmon, PLC, Phoenix, By Brian Imbornoni and Eric D. Gere, Counsel for Defendant/Appellee/Cross–Appellant Lloyd E. Banning, Sr.

Presiding Judge Andrew W. Gould delivered the opinion of the Court, in which Judge Peter B. Swann and Judge Patricia A. Orozco joined.

## OPINION

GOULD, Judge:

¶ 1 ABCDW, LLC, Van Leeuwen Buckeye, LLC, Melanie Nevitt, LLC, and Pantano Banning, LLC ("Landlords") appeal the superior court's denial of their motion for judgment as a matter of law and motion for new trial on Lloyd E. Banning, Sr.'s counterclaims. They also appeal from the court's grant of summary judgment for Banning on their statutory claim under Arizona Revised Statutes ("A.R.S.") section 3–114. Banning cross-appeals the court's order granting summary judgment on Landlords' claims and its award of attorneys' fees to Landlords as the prevailing party at trial. For the following reasons we affirm in part, reverse in part, and remand for further proceedings.

## FACTS AND PROCEDURAL BACKGROUND

¶ 2 Banning farmed several parcels of land he leased from Landlords ("Banning Lease"). The Banning Lease, entered into in 2006, provided an initial term of two years with three automatic one-year extensions. If Landlords sought to lease the land beyond the initial five-year term, which ended in January 2011, the Banning Lease gave Banning a right of first refusal to continue leasing the parcels.[1]

¶ 3 In 2009, one year before the end of his lease, Banning planted 549 acres of alfalfa. In the fall of 2010, he planted another 360 acres of alfalfa. At the time Banning planted the alfalfa, there was no assurance from Landlords that the Banning Lease would be renewed.

¶ 4 In November 2010, Landlords informed Banning they would not be renewing the Banning Lease. Pursuant to the right of first refusal, Landlords provided Banning notice of a third party offer to lease the parcels. The third party, Double Anchor Farms, agreed to lease the property at a rate of $275.00 per acre; this offer was based on the understanding the existing alfalfa stands would remain and continue to produce a crop for a number of years.

¶ 5 Banning informed Landlords he would not exercise his right of first refusal at the rental rate of $275.00 an acre, and that if Landlords could provide a copy of a signed lease at that rate, he would relinquish the property at the end of the lease term. Landlords provided Banning a signed copy of the lease with Double Anchor Farms ("Double Anchor Lease"). The Double Anchor Lease provided for a rental rate of $275.00 per acre for a term of one year, commencing on January 23, 2011, and expiring on January 22, 2012. At the time it signed the lease, Double Anchor Farms tendered full payment for the entire term of the lease. Additionally, Section 4.3 of the Double Anchor Lease stated that "in the event the crops currently planted on the Premises are disced or otherwise destroyed prior to the commencement date of the term of this Lease, the rent set forth in Section 2.1 shall be equitably adjusted by Landlord and Tenant."

---

1. The subject provision states: "If the Lessor intends to lease the property beyond five (5) years, Lessee shall have the right of first refusal."

¶ 6 After receiving a copy of the Double Anchor Lease, Banning declined to exercise his right of first refusal. Thereafter, Banning informed Landlords that he would complete his last alfalfa cutting in early January 2011, and that the newly planted alfalfa stands were available for Double Anchor Farms to purchase. Banning stated that if he was not paid for the alfalfa, he would plow it under at the conclusion of his lease. Landlords objected and refused to pay Banning for the alfalfa because they contended Banning did not own it. The parties ceased communication at that point and did not reach an agreement.

¶ 7 In January, shortly before the conclusion of the lease, Banning harvested his last alfalfa cutting and then disced the fields, destroying all of the alfalfa plants. In doing so, he also plowed under the borders in place to control irrigation of the fields. Accordingly, pursuant to section 4.3 of the Double Anchor Lease, Landlords renegotiated the rental rate in the Lease to $125.00 per acre. This litigation followed.

¶ 8 Landlords sued Banning for intentional interference of contractual relations, unauthorized destruction of a crop under A.R.S. § 3–114, conversion, and breach of contract. Banning counterclaimed that Landlords had breached both the Banning Lease and the implied covenant of good faith and fair dealing by not offering Banning a valid right of first refusal.

¶ 9 The parties filed cross-motions for summary judgment. Banning sought summary judgment on all of the Landlords' claims, arguing he was the rightful owner of the alfalfa and was entitled to plow it under at the end of his lease. Landlords argued the alfalfa was a fixture under the Banning Lease that belonged to Landlords and Banning was not authorized to destroy it. The court concluded that the alfalfa plants were fixtures and should have remained with the land; thus, it granted Landlords' motion for summary judgment as to Banning's liability on Landlords' claims, reserving the issue of damages for the jury.

¶ 10 Banning filed a motion for reconsideration. He challenged the court's rationale for finding him liable under A.R.S. § 3–114. He also argued the Landlords had not shown they were entitled to summary judgment on their interference with contract claim. Additionally, because the court concluded that the alfalfa was a fixture, and thus part of the realty, Banning argued he could not be liable for conversion because a conversion claim requires that personal property be converted.

¶ 11 Landlords objected to Banning's motion for reconsideration both on the merits and procedurally; they argued Banning had waived these arguments by not raising them during the summary judgment briefing. However, the court granted Banning's motion for reconsideration as to Landlords' A.R.S. § 3–114 claim and their conversion claim. Upon reexamination, the court concluded that A.R.S. § 3–114 did not apply to the alfalfa plants and that Banning could not be found liable for conversion.

¶ 12 The parties filed another set of motions for summary judgment. Based on the court's prior rulings, Banning moved for summary judgment regarding Landlords' damage claims for breach of contract and intentional interference with contract. Landlords sought summary judgment on Banning's counterclaims for breach of contract and breach of the implied covenant of good faith and fair dealing. The court denied both parties' motions, and sent the Landlords' claims for damages and Banning's counterclaims to the jury.

¶ 13 On a single verdict form, the jury awarded Landlords $520,000.00 in compensatory damages and $75,000.00 in punitive damages. The compensatory damage award did not distinguish the amount of damages awarded to Landlords on each of their respective claims for breach of contract and intentional interference with contract. It also found for Banning on his claims for breach of contract and breach of the duty of good faith and fair dealing; it awarded Banning $318,150.00 in damages against Landlords.

¶ 14 After trial, Landlords filed a motion for judgment as a matter of law and a motion for new trial on Banning's counterclaims. Landlords continued to argue that Banning had been given a bona fide offer that triggered his right of first refusal, and that

Banning had waived that right. The court denied Landlords' motions, and this appeal followed.

### DISCUSSION

¶ 15 Landlords appeal the court's denial of their motion for judgment as a matter of law and motion for new trial on Banning's counterclaims. They also argue the court incorrectly granted Banning summary judgment on their statutory claim under A.R.S. § 3-114. Banning appeals the court's determination that the alfalfa was a fixture belonging to Landlords at the end of the lease. He argues he should have been granted summary judgment on Landlords' claims and that he should have been awarded attorneys' fees in the trial court.

### I. Standard of Review

¶ 16 When reviewing a grant of summary judgment, we consider the evidence in the light most favorable to the non-moving party. *Unique Equip. Co. v. TRW Vehicle Safety Sys., Inc.*, 197 Ariz. 50, 52, ¶ 5, 3 P.3d 970 (App. 1999). We decide de novo whether there are any genuine issues of material fact, and whether the trial court correctly applied the law. *Airfreight Exp. Ltd. v. Evergreen Air Center, Inc.*, 215 Ariz. 103, 110, 158 P.3d 232 (App. 2007). We will affirm a grant of summary judgment if the judgment is correct for any reason. *Desarrollo Immobiliario y Negocios Indus. De Alta Tech. De Hermosillo, S.A. De C.V. v. Kader Holdings Co. Ltd.*, 229 Ariz. 367, 373–74, ¶ 21, 276 P.3d 1 (App. 2012). We review the denial of a motion for judgment as a matter of law de novo. *Goodman v. Physical Res. Eng'g Inc.*, 229 Ariz. 25, 27, ¶ 6, 270 P.3d 852 (App. 2011).

### II. Ownership of the Alfalfa

¶ 17 The key issue in this case is which party owned the alfalfa plants. The law generally makes a distinction between the ownership of a perennial plant, i.e., the roots of the alfalfa that will produce cuttings for a period of years, and the alfalfa crop, which consists of the alfalfa cuttings periodically harvested from the plant. *See Mattis v. St. Louis & S.F. Ry. Co.*, 138 Mo.App. 61, 119 S.W. 998, 998 (1909) (distinguishing between the perennial root and the matured crop); *see also Gentry v. Alexander*, 311 Ky. 344, 224 S.W.2d 143, 144 (1949) (distinguishing the crop from the perennial root or plant that produces the crop). Here, the parties agree that Banning owned the alfalfa crops he cut and harvested during the term of the Banning Lease. The parties disagree, however, as to whether the entirety of the perennial alfalfa plants were fixtures that belonged to Landlords.

¶ 18 The parties can direct by contract whether a plant will be considered a fixture to the realty. Here, Section 7(c) of the Banning Lease provides that:

> all alterations, improvements, additions and utility installations ... which may be made on the Premises and which become fixtures to the Premises, shall become property of lessor and shall remain and be surrendered with the Premises at the expiration of the term.

¶ 19 If applicable, this provision is ambiguous in terms of explaining whether the alfalfa plants are considered fixtures. Additionally, because we have no extrinsic evidence of the parties' intent in the contract, we must look to the presumed intent that arises from their actions. *See Dept. of Rev. v. Outdoor Advertisers*, 202 Ariz. 93, 98, 41 P.3d 631 (App. 2002) (stating that objective actions indicate a party's intent to make a fixture); *Murray v. Zerbel*, 159 Ariz. 99, 101, 764 P.2d 1158 (1988) (looking to objective manifestation of party's intent).

### A. Fixtures

¶ 20 Merely affixing personal property to real estate may or may not cause it to become a fixture of the realty. *Fish v. Valley Nat. Bank of Phx.*, 64 Ariz. 164, 170, 167 P.2d 107 (1946). However, if it becomes a fixture, then it belongs to the landlord after the lease term ends. *Id.* Generally, for a chattel to become a fixture the following three requirements must be met: "There must be an annexation to the realty or something appurtenant thereto; the chattel must have adaptability or application as affixed to the use for which the real estate is appropri-

ated; and there must be an intention of the party to make the chattel a permanent accession to the freehold." *Id.* (citing 36 C.J.S., Fixtures, § 1, p. 892).

¶ 21 Live plants can become fixtures to realty. *First Wisconsin Nat. Bank of Milwaukee v. Fed. Land Bank of St. Paul*, 849 F.2d 284, 288 (7th Cir. 1988). For example, under a similar fixture test to the one stated in Arizona, cranberry vines have been found to be fixtures. *Id.* at 287 (holding that due to the "perennial nature of the cranberry vine root system and the permanency of the cranberry vines once planted in the specially prepared bogs," the court reasoned that the landowner acquired "some interest in the cranberry vines ... when the cranberry vines were so affixed to the property"). However, whether the tenant intended to make a permanent accession to the realty must be determined according to the circumstances of each case. *See Lewis v. Lewis Nursery, Inc.*, 80 N.C.App. 246, 342 S.E.2d 45, 49 (1986) (stating that strawberry plants, which were planted as nursery stock and expected to be removed annually in order to be harvested, were not fixtures).

¶ 22 Banning claims the alfalfa plants were not fixtures, citing several cases holding that under an ordinary lease "the title to the product of the property leased [is] in the lessee, and [ ] he [can] mortgage or dispose of it without the consent of the landlord." *Farmers Mut. Mfg. & Ginning Co. v. Thompson*, 60 Ariz. 37, 41, 131 P.2d 413 (1942); *see also Valley Prods. v. Kubelsky*, 49 Ariz. 500, 508–09, 68 P.2d 69 (1937) (stating that in a lease the title to the crop produced is in the lessee) (criticized on other grounds by *Mtn. States Tel. & Tel. Co. v. Kelton*, 79 Ariz. 126, 130, 285 P.2d 168 (1955)).

¶ 23 Banning's cases are inapposite. Specifically, Banning's cases simply address the distinction between the rights of a landlord and tenant under a lease, as compared to the rights of a person who farms land under a cropper's contract. *Farmers*, 60 Ariz. at 41, 131 P.2d 413. These cases hold that a tenant farmer "owns" the product he farms, while a farmer under a cropper's contract "becomes merely the servant of the owner of the land, being paid for his labor in a share of the crop." *Gray v. Robinson*, 4 Ariz. 24, 32, 33 P. 712 (1893) (stating that the farmer "agrees to work the land of another for a share of the crop, without obtaining any interest in the land or ownership in the crop" until it is divided); *see also Kubelsky*, 49 Ariz. at 508, 68 P.2d 69. They do not, however, address the issue involved in this case: whether perennial plants are fixtures under a fixed-term lease.

## B. The Doctrine of Emblements and Away–Going Crops

¶ 24 The common law principles established in the doctrine of emblements and the doctrine of away-going crops are instructive as to whether the alfalfa plants were fixtures. Under the doctrine of emblements, "if a crop is planted by one rightfully in possession of land [such as a tenant], and the person unexpectedly loses possession of the land prior to harvest, he still has ownership rights to the crops he planted." *Andersen v. Bureau of Indian Affairs*, 764 F.2d 1344, 1347 (9th Cir. 1985). The doctrine of emblements, however, does not apply if "the tenancy is of a fixed rather than indefinite duration, or if the tenancy is terminated due to some act or default of the tenant." *Id.* at 1348. Instead, under the doctrine of away-going crops, "a tenant who plants a crop knowing the term of his lease will expire before it can be harvested loses all his interest in the crop upon termination of the lease." *Id.*; *see also Triggs v. Kahn*, 167 A.D.2d 680, 681–82, 563 N.Y.S.2d 262 (N.Y. 1990) (stating that the doctrine of emblements applies to an annual crop not a perennial plant).

¶ 25 Thus, under the doctrine of away-going crops, a tenant for a fixed term of years who plants a crop that will produce beyond the term of the lease is viewed as having intended the plant and any future crops harvested from that plant to remain with the realty. *Andersen*, 764 F.2d at 1347; *see T.R. Inc. of Ashland v. Brandon*, 32 Kan.App.2d 649, 87 P.3d 331, 336 (2004) (stating that a tenant who plants an alfalfa crop during a fixed tenancy for years "without a written agreement giving it the necessary years to recover its full cost and profit"

does so at his own risk); *Triggs*, 167 A.D.2d at 682, 563 N.Y.S.2d 262 (stating that alfalfa-timothy, "grasses growing from perennial roots, are regarded as realty while they are unsevered from the soil and their ownership follows the ownership of the land").

### C. The Alfalfa Plants Were Fixtures

¶ 26 Applying these principles to this case, we conclude the alfalfa plants were fixtures that became part of the realty and Banning was not authorized to destroy them. *See Andersen*, 764 F.2d at 1348. Alfalfa is a perennial crop. *See Staub v. Muller*, 7 Cal.2d 221, 228, 60 P.2d 283 (1936). The parties agree that alfalfa has a useful life of at least from 3 to 5 years. Banning planted the alfalfa in the last year of his fixed-term tenancy. Because Banning knew the alfalfa would continue to produce beyond the term of his lease, we infer, based on the law, that his intent was for the alfalfa plants to remain with the realty. Indeed, there is no other reasonable inference for the portion of alfalfa he planted just three months before the expiration of his lease.

¶ 27 Because the alfalfa plants were fixtures that belonged to the Landlords, Banning's unauthorized destruction of the alfalfa plants constituted a material breach of section 7(c) of the Banning Lease, which provided that fixtures made on the property were the property of Landlords "and shall remain and be surrendered with the Premises at the expiration of the term." Accordingly, we conclude the court correctly granted the Landlords' motion for summary judgment on their breach of contract claim.

### III. Landlords' Claim for Statutory Damages Pursuant to A.R.S. § 3–114

¶ 28 Landlords challenge the superior court's ruling that A.R.S. § 3–114 does not apply to Banning's destruction of the alfalfa plants. Landlords claim the statute's reference to "commercial crops" applies to the subject alfalfa. In contrast, Banning asserts the statute only applies to crops grown by a research facility for the purpose of research or testing.

¶ 29 We review issues of statutory interpretation de novo. *City of Tucson v. Clear Channel Outdoor, Inc.*, 218 Ariz. 172, 178, ¶ 5, 181 P.3d 219 (App. 2008). Our goal in interpreting a statute is to "ascertain the legislature's intent." *Lyons v. State Bd. of Equalization*, 209 Ariz. 497, 499, ¶ 8, 104 P.3d 867 (App. 2005). To do so "we look first to the [statute's] language and will ascribe plain meaning to its terms unless the legislature assigned a special meaning to one or more terms." *Id.* (internal citations omitted). If the statute is ambiguous and there is more than one rational or reasonable interpretation of the statute "we consider the statute's context; its language, subject matter, and historical background; its effects and consequences; and its spirit and purpose." *Bentley v. Bldg. Our Future*, 217 Ariz. 265, 270, ¶ 13, 172 P.3d 860 (App. 2007). " 'Legislative intent ... can [also] be discovered by examining the development of a particular statute.' " *State v. Hoggatt*, 199 Ariz. 440, 443, ¶ 8, 18 P.3d 1239 (App. 2001) (quoting *Carrow Co. v. Lusby*, 167 Ariz. 18, 20, 804 P.2d 747 (1990)).

¶ 30 A.R.S. § 3–114 states the following:

A person who knowingly damages, destroys or removes any legal crop or crop product that is grown for commercial purposes or for testing or research purposes in the context of a product development program in conjunction or coordination with a private research facility, a university or a federal, state or local government agency is liable for:

Up to twice the market value of the damaged, destroyed or removed crop, measured before the damage or destruction.

Up to twice the actual costs of production, research, testing, replacement and crop development directly related to the damaged, destroyed or removed crop.

Litigation costs including court costs, attorney fees and expert witness fees.

A.R.S. § 3–114.

¶ 31 In construing the plain text of the statute, we conclude A.R.S. § 3–114 applies to commercial crops such as the alfalfa plants grown by Banning. Under canons of statutory construction, we read the "or" separating "commercial purposes" and "testing or research purposes" to be disjunctive. *State v. Piotrowski*, 233 Ariz. 595, 598, ¶ 16, 315

P.3d 1252 (App. 2014). Additionally, the last-antecedent rule directs that the last qualifying phrase applies to the phrase directly before it. *New Sun Bus. Park LLC v. Yuma Cty.*, 221 Ariz. 43, 47, ¶ 15, 209 P.3d 179 (App. 2009). Applying these canons, the statute applies to two distinct types of crops: (1) crops grown for commercial purposes, and (2) crops grown for testing or research purposes in the context of a product development program in conjunction with a research facility.

¶ 32 This construction is supported by the statute's legislative history. A.R.S. § 3–114 was modeled after a California law creating liability for destruction of crops grown in conjunction with research facilities. *See* Cal. Food & Agric. Code § 52100; see also Arizona House committee Minutes, 2/21/2001; *see also* Arizona Senate Fact Sheet, 2001 Reg. Sess. H.B. 2481 (explaining that the law was in response to the increase in destruction of agricultural crops grown by research facilities). The California law was specifically designed to protect crops known "to be the subject of testing or a product development program." Cal. Food & Agric. Code § 52100(a). However, the Arizona Legislature added the term "commercial crops" to the language of the California statute. A.R.S. § 3–114(A). This legislative history indicates the addition of the term "commercial crops" was intended to broaden the scope of the Arizona statute beyond the language of the California statute. Arizona House Committee Minutes, 2/21/2001 (stating that the purpose of the statute is to provide a means to recover the lost value of the destroyed area in addition to the criminal charges such destruction would incur); *cf. Grubaugh v. Blomo ex rel. Cty. of Maricopa*, 238 Ariz. 264, 267, ¶ 9, 359 P.3d 1008 (App. 2015) (holding that when the Arizona legislature alters the language of an Arizona statute, we presume it intended to change the law); *Washburn v. Pima Cty.*, 206 Ariz. 571, 576, ¶ 11, 81 P.3d 1030 (App. 2003) (same).

¶ 33 The language of § 3–114 also departs from the California statute by providing for two separate damage remedies: (1) "[u]p to twice the market value" of the destroyed crop, and (2) "[u]p to twice the actual costs of production, research, testing, replacement and crop development." A.R.S. § 3–114(A)(1) & (2); *compare with* Cal. Food & Agric. Code § 52100 (only providing damages in the amount of research, testing, and crop development costs). While the remedy contained in section (A)(2) clearly applies to crops grown for research or testing purposes, the remedy in section (A)(1) provides damages based on market value, indicating the Arizona Legislature intended a separate remedy for the destruction of commercial crops. *See Hoggatt*, 199 Ariz. at 443, ¶ 10, 18 P.3d 1239 ("Each word or term in a statute . . . is to be given meaning.").

¶ 34 Considering both the language of the statute and the statutory history, we conclude the Legislature intended to extend the protections contained in A.R.S. § 3–114 to include commercial crops such as the alfalfa planted by Banning. Thus, given the fact that the subject perennial alfalfa plants should have remained with the land and any future cuttings they would produce were away-going crops that belonged to the Landlords, Banning's discing, or plowing under of the alfalfa plants constituted destruction of the plants prohibited by A.R.S. § 3–114. *Supra,* ¶¶26–27.

¶ 35 Accordingly, the superior court erred in ruling that A.R.S. § 3–114 did not apply to this case. We therefore vacate the court's grant of Banning's motion for reconsideration and remand Landlord's statutory claim to the superior court for further proceedings consistent with this decision.

## IV. Landlords' Claim for Intentional Interference with Contract

¶ 36 Banning challenges the grant of summary judgment for Landlords on their claim of intentional interference with contractual relations. He argues there were material issues of fact regarding whether he intended to induce a breach of contract and whether he acted improperly.

¶ 37 "Tort liability may be imposed upon a defendant who intentionally and improperly interferes with the plaintiff's rights under a contract with another if the interference causes the plaintiff to lose a

right under the contract." *Snow v. W. Sav. & Loan Ass'n,* 152 Ariz. 27, 33, 730 P.2d 204, 210 (1986) (citing W. PROSSER & W. KEETON, LAW OF TORTS § 129, at 978 (5th ed. 1984)). A prima facie case of intentional interference with contract requires alleging the following:

(1) the existence of a valid contractual relationship;

(2) knowledge of the relationship on the part of the interferor;

(3) intentional interference inducing or causing a breach;

(4) resultant damage to the party whose relationship has been disrupted; and

(5) that the defendant acted improperly.

*Id.* (citing *Wagenseller v. Scottsdale Memorial Hospital,* 147 Ariz. 370, 386–88, 710 P.2d 1025, 1025–26 (1985)).

¶ 38 To be liable for intentional interference with contract, it is not necessary that a defendant cause an actual breach of the contract between the plaintiff and a third party. *See Bar J Bar Cattle Co., Inc. v. Pace,* 158 Ariz. 481, 483, 763 P.2d 545, 547 (App. 1988) ("[I]t is a tort to improperly cause the cancellation, rather than a breach of a terminable contract."). Rather, the tort may arise when a defendant causes a party's performance under the subject contract to be more expensive or burdensome. *Plattner v. State Farm Mut. Auto. Ins. Co.,* 168 Ariz. 311, 316, 812 P.2d 1129, 1134 (App. 1991); *Wagenseller,* 147 Ariz. at 386, 710 P.2d 1025 (stating that causing a breach or termination of the relationship or expectancy is intentional interference).

¶ 39 The tort is intentional in the sense that the defendant must have intended to interfere with the plaintiff's contract. *Snow,* 152 Ariz. at 33, 730 P.2d 204. Specifically, a plaintiff must show that the defendant either intended or should have known that a particular result was likely to be produced by his conduct. *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund,* 201

Ariz. 474, 494, ¶ 78, 38 P.3d 12 (2002) ("The essential thing is the intent to cause the result.") (quoting Restatement (Second) of Torts § 766 cmt. h).

¶ 40 The record shows that Banning's action discing the alfalfa constituted an intentional interference with Landlords' lease with Double Anchor Farms. Banning was provided a copy of the Double Anchor Lease; as a result, he knew or should have known that if the alfalfa was destroyed Landlords would lose their expectancy of $275.00 per acre and would be forced to renegotiate for a lesser rate. Nonetheless, Banning intentionally destroyed the alfalfa plants.

¶ 41 Banning argues, in a passing reference, that Landlords did not meet their burden to show his actions were improper.[2] We disagree.

¶ 42 To be liable for tortious interference with a contract, the defendant's actions must be improper as to motive or means. *Safeway Ins. Co., Inc. v. Guerrero,* 210 Ariz. 5, 11, ¶ 20, 106 P.3d 1020 (2005). Where the "intent" element focuses on the mental state of the defendant, the "improper" element " 'generally is determined by weighing the social importance of the interest the defendant seeks to advance against the interest invaded.' " *Id.* at ¶ 21 (quoting *Snow,* 152 Ariz. at 33, 730 P.2d 204).

¶ 43 The undisputed facts show that Banning's actions were improper. Banning intentionally destroyed newly planted, viable alfalfa. Banning did so knowing that Landlords had entered a lease with Double Anchor Farms for a leasehold that contemplated growing, harvestable alfalfa plants. Additionally, as noted above, Landlords, not Banning, owned the alfalfa plants. *Supra,* ¶¶ 26–27. Banning received no benefit from destroying the alfalfa; he simply destroyed a crop that had great value to both Landlords and Double Anchor Farms.

---

2. Landlords argue Banning waived this argument by failing to raise it in his motion for summary judgment and motion for reconsideration. However, because we conclude there is no genuine issue of material fact precluding summary judgment on this issue, we address it on appeal.

¶ 44 Accordingly, Landlords were entitled to summary judgment on their intentional interference with contract claim.[3]

## V. Banning's Counterclaims

¶ 45 Banning's counterclaims alleged that Landlords breached the right of first refusal and violated the implied covenant of good faith and fair dealing. Landlords moved for summary judgment on Banning's counterclaims, arguing Banning waived his right of first refusal; they also argued Banning's material breach of the lease relieved them of any duty to perform. The court denied the motion for summary judgment and sent Banning's counterclaims to the jury.

¶ 46 At the close of trial, Landlords filed a motion for judgment as a matter of law on Banning's counterclaims. Landlords re-urged the argument that Banning had waived his right of first refusal; additionally, Landlords argued there was no breach because Banning was presented with a bona fide offer triggering his right of first refusal.

### A. Right of First Refusal

¶ 47 A right of first refusal is the "[r]ight to have first opportunity to [lease] real estate when such becomes available, or [the] right to meet any other offer." *Martinesi v. Tidmore*, 158 Ariz. 53, 54, 760 P.2d 1102, 1103 (App. 1988). It is a contractual right requiring the owner to first offer the premises to the person holding the right of first refusal at the same price offered by a third person. *Phipps v. CW Leasing, Inc.*, 186 Ariz. 397, 400, 923 P.2d 863, 869 (App. 1996) (quoting *Meyer v. Warner*, 104 Ariz. 44, 47, 448 P.2d 394, 397 (1968)). "If the person given this right refuses to meet the bona fide offer, the owner can [lease] the property to the offeror." *Id.* To avoid waiver, the holder must exercise his right in strict compliance with the terms of the agreement. *Univ. Realty & Dev. Co. v. Omid–Gaf, Inc.*, 19 Ariz.App.

488, 490, 508 P.2d 747 (1973) (citing *Hayward Lumber & Investment Co. v. Const. Prod. Corp.*, 117 Cal.App.2d 221, 226, 255 P.2d 473 (1953)).

¶ 48 Banning's counterclaims turn primarily on whether the lease agreement between Landlords and Double Anchor Farms was a bona fide offer. "A right of first refusal is triggered by a bona fide third-party offer to purchase the property burdened by the right." *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 805 N.E.2d 957, 962 (2004). "A third-party offer is bona fide if it was made 'honestly and with serious intent,' that is, if the offeror genuinely intends to bind itself to pay the offered price." *Id.* at 963 (quoting *Mucci v. Brockton Bocce Club, Inc.*, 19 Mass.App. Ct. 155, 472 N.E.2d 966, 968 (1985)).

¶ 49 In a different context, Arizona has defined what constitutes a bona fide offer using similar considerations:

> The offer must be made in good faith, by a man of good judgment, acquainted with the value of the real estate and of sufficient ability to pay ... and it must be determined whether [it is] made with reference to the fair cash market value of the property or to supply a particular need....

*State v. McDonald*, 88 Ariz. 1, 10, 352 P.2d 343 (1960) (quoting *City of Chicago v. Harrison–Halsted Bldg. Corp.*, 11 Ill.2d 431, 436, 143 N.E.2d 40 (1957)) (defining bona fide offer in context of a government takings case to establish market value). These same considerations have been used to evaluate whether an offer is bona fide in the context of a right of first refusal. *See Schroeder v. Duenke*, 265 S.W.3d 843, 848 (Mo. Ct. App. 2008) ("[A] bona fide offer is one that is made in good faith, by a person with good judgment and acquainted with the value of the property, with sufficient ability to pay in cash, and based upon fair market value.").

---

3. Banning has not challenged the propriety of the punitive damage award separate from his contention that he was not liable for the underlying tort of intentional interference with contract. Whether Banning's intentional interference with Landlords' contract rises to the level of conduct that warrants a punitive damage award is unclear. *See Rawlings v. Apodaca*, 151 Ariz. 149, 162, 726 P.2d 565, 578 (1986) (stating that plaintiff must show the "evil hand ... was guided by an evil mind" to obtain punitive damages). However, because Banning has not raised this issue on appeal, we deem it waived. *State v. Carver*, 160 Ariz. 167, 175, 771 P.2d 1382, 1400 (1989) ("Failure to argue a claim usually constitutes abandonment and waiver of that claim.").

¶ 50 The approach discussed in *Uno Restaurants* harmonizes with the analysis in *McDonald*. When determining whether a third party offer is bona fide, the focus is on whether the offeror intends to be bound by the offer and is ready and able to pay the price stated. If that is the case, the holder of a right of first refusal must decide if he is willing to meet the offer. *Uno Restaurants*, 805 N.E.2d at 963. The fact that an offer may be designed to compete with the holder of the right does not alter the fact that it is a bona fide offer. *See id.*

¶ 51 Banning argues the Double Anchor Lease was not a bona fide offer because Landlords did not extend the same offer to him as was tendered to Double Anchor Farms. Banning reasons that the terms of the Double Anchor Lease would effectively force him to pay twice for alfalfa he planted at his own expense; in short, he claims Landlords sought to make him pay for his own alfalfa to renew his lease.

¶ 52 We reject Banning's argument because, as a matter of law, he did not own the alfalfa. *Supra*, ¶¶26–27. As a result, the record clearly shows that Banning received the same offer that was provided to Double Anchor Farms.

¶ 53 Banning also contends the Double Anchor Lease offer was not a bona fide offer because it was indefinite as to price; specifically, the Lease permitted the parties to renegotiate the price per acre in the event the alfalfa was destroyed.

¶ 54 We reject Banning's argument. The first offer provided a definite price of $275.00 per acre; indeed, by paying the full amount of the lease in advance, Double Anchor Farms showed that it intended to be bound by the offer and was ready and willing to pay the stated price.

¶ 55 Banning also claims Landlords deprived him of his right of first refusal as to the lower rental rate negotiated between Landlords and Double Anchor Farms for the land without the alfalfa. However, as discussed above, Banning materially breached the contract by destroying the alfalfa before Landlords negotiated the second rate. In fact, it is only because of Banning's mate-

rial breach that Landlords were required to negotiate the lower rate. "[A]n uncured material breach of contract relieves the non-breaching party from the duty to perform and can discharge that party from the contract." *Murphy Farrell Dev., LLP v. Sourant*, 229 Ariz. 124, 133, ¶ 33, 272 P.3d 355 (App. 2012). Thus, once Banning breached his contract with Landlords, he was no longer entitled to a right of first refusal under the Banning Lease.

¶ 56 Accordingly, we conclude Landlords were entitled to judgment as a matter of law on Banning's counterclaim for breach of contract.

### B. Implied Covenant of Good Faith and Fair Dealing

¶ 57 Landlords claim the court erred in denying their motion for judgment on the pleadings as to Banning's claim for breach of the implied covenant of good faith and fair dealing. Banning argues Landlords violated the implied covenant of good faith and fair dealing by expecting him to pay for his own alfalfa stands to exercise his right of first refusal.

¶ 58 "The law implies a covenant of good faith and fair dealing in every contract . . . [t]he essence of that duty is that neither party will act to impair the right of the other to receive the benefits which flow from their agreement or contractual relationship." *S.W. Savs. & Loan Ass'n v. SunAmp Sys, Inc.*, 172 Ariz. 553, 557, 838 P.2d 1314, 1318 (App. 1992). However, parties to a contract are entitled to act to protect their financial interest and contractual rights without violating the covenant of good faith and fair dealing. *S.W. Savs.*, 172 Ariz. at 558–59, 838 P.2d 1314; see also *Omid–Gaf*, 19 Ariz.App. at 490, 508 P.2d 747 (stating that a right of first refusal is strictly construed); *Uno Restaurants*, 441 Mass. at 383, 805 N.E.2d 957 (stating that the covenant of good faith and fair dealing does not create rights not otherwise provided for in the existing contract).

¶ 59 The court erred in denying Landlords' motion. Banning had no justifiable expectation to receive a benefit from the subject alfalfa because, as a matter of law, he did not

own the alfalfa. *Supra,* ¶¶26–27. Thus, Landlords did not impair Banning's right to receive a benefit he reasonably expected to receive under the Banning Lease.

## VI. Attorneys' Fees in the Trial Court

¶ 60 Banning seeks reversal of the superior court's award of attorneys' fees to Landlords. He argues Landlords were not the prevailing parties under the terms of the Banning Lease and they did not prevail in the totality of the litigation. We review an attorneys' fee award for an abuse of discretion. *Orfaly v. Tucson Symphony Soc'y,* 209 Ariz. 260, 265, ¶ 18, 99 P.3d 1030 (App. 2004). We review the legal question of whether a trial court has authority to award fees de novo. *Geller v. Lesk,* 230 Ariz. 624, 627, ¶ 8, 285 P.3d 972 (App. 2012).

¶ 61 In light of our resolution of the issues on appeal, Landlords were eligible for an award of attorneys' fees as prevailing parties in the superior court. They have prevailed on their breach of contract and tortious interference with contract claims, and Banning has not prevailed on any of his counterclaims. Accordingly, it was proper for the superior court to award attorneys' fees to Landlords.

## VII. Attorneys' Fees on Appeal

¶ 62 Landlords have requested an award of attorneys' fees on appeal. Upon compliance with ARCAP 21 they are entitled to their reasonable attorneys' fees on appeal. A.R.S. § 12–341.01.

## CONCLUSION

¶ 63 The alfalfa planted by Banning during the final year of his lease was a trade fixture that belonged to Landlords. Thus, Banning violated the lease when he destroyed the alfalfa plants. We therefore affirm the superior court's grant of summary judgment to Landlords on their breach of contract claim. We also affirm, based on Banning's intentional destruction of the alfalfa, the superior court's grant of summary judgment in favor of Landlords on their intentional interference with contract claim.

¶ 64 We also conclude that A.R.S. § 3–114 applies to the destruction of the subject alfalfa plants. We therefore reverse the superior court's grant of Banning's motion for reconsideration regarding Landlords' statutory claim and remand the claim for further proceedings.

¶ 65 Finally, we conclude Landlords were entitled to judgment as a matter of law on Banning's counterclaims. Accordingly, we reverse the judgments and vacate the damage award entered in favor of Banning. As a result, the superior court's award of attorneys' fees for Landlords is also affirmed.